Filed 2/29/16  P. v. Chavez CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LEVIT CHAVEZ, JR.,<br><br>        Defendant and Appellant. | A141830<br><br>(City & County of San Francisco<br>Super. Ct. No. SCN214815) |

Defendant Levit Chavez, Jr. was convicted by a jury of second degree murder of his father, Levit Chavez, Sr. (Chavez, Sr.), and first degree attempted murder of his father's girlfriend, Nelsey Flores (Nelsey).[1] (Pen. Code, §§ 187, subd. (a), 664.)  He was found to have used a deadly weapon (Pen. Code, § 12022, subd. (b)(1) & (3)), and to have inflicted great bodily injury on Nelsey (Pen. Code, § 12207, subd. (a)).  He was sentenced to 20 years to life in prison.

The defense claimed that Nelsey murdered Chavez, Sr., and that defendant stabbed Nelsey in self-defense.  In support of that claim, defendant called numerous witnesses who testified that Nelsey was physically violent, volatile, and extremely jealous of Chavez, Sr. who was having an affair.  Over defense objection, the court allowed the prosecution to elicit testimony from one of those witnesses that defendant was also capable of violence.  Defendant argues that this evidentiary ruling was error that requires that his convictions be reversed.

---

[1] For clarity, we will sometimes use first names to refer to people who have the same last name as others involved in the case.  No disrespect is intended.

1

We disagree. The testimony defendant highlights was properly admitted under Evidence Code section 1103, which allows introduction of a defendant's propensity for violence when he or she claims to have acted in self-defense. Moreover, the evidence was minimally significant to the prosecution's case. We affirm.

## I. BACKGROUND

In May 2009, eight-year-old Rudolpho Chavez (Rudy) lived with his mother Nelsey and his father Chavez, Sr. above an apartment occupied by Irma Castanon. Jose Zecena lived in a backyard apartment at the residence, and defendant spent the night of May 23 in a mobile home across the street. Castanon testified that on the morning of May 24, Rudy knocked on her door, crying and shaking, and said that "his brother was stabbing his mother." Zecena testified that he saw two men fighting in the backyard that morning, and saw Chavez, Sr. drag himself to the wall of Zecena's apartment. Rudy came out of Castanon's apartment, and Zecena and his wife brought Rudy to their apartment. Rudy told them defendant "killed my daddy." Chavez, Sr. bled to death from multiple stab wounds. Nelsey sustained multiple stab wounds, almost died, and had to undergo a splenectomy.

Rudy testified that he heard defendant and Chavez, Sr. argue that morning. After the argument, defendant came in and went to the bathroom. Nelsey was cooking in the kitchen. From his bedroom, Rudy saw defendant leave the bathroom and approach Nelsey. Nelsey screamed and ran into Rudy's room while defendant tried to stab her. She tried to close the door to the room but defendant pushed it open and pushed her onto a chair. She was bleeding. Rudy ran to the downstairs neighbors and told them to call the police.

Nelsey testified that she was in the kitchen that morning, and defendant and Chavez, Sr. were in the backyard. Defendant came inside and went to the bathroom. When he came out of the bathroom, he grabbed her from behind, and stabbed her repeatedly. Nelsey said the attack was completely unprovoked. "It was like he had the devil in him." Nelsey told police that defendant had asked Chavez, Sr. for money, but

she otherwise had no idea what might have prompted the attack. Nelsey screamed to Chavez, Sr. for help.

Nelsey testified that while defendant was attacking her, Chavez, Sr. came up to a deck next to the kitchen, defendant attacked him with the knife, and they went down to the backyard. Nelsey locked the door to her bedroom and went to Rudy's room to try to protect him and herself. Defendant kicked in her bedroom door and entered Rudy's room. He resumed stabbing her, and Rudy "took off running." Defendant left shortly thereafter.

Castanon testified that when she opened her door for Rudy she saw defendant leave the house holding a bloody knife. Nelsey testified that she went out to the front of the house and phoned her mother. When police arrived, Nelsey was being treated by paramedics on the front steps. Chavez, Sr. was dead in the backyard, face down in a pool of blood.

Defendant went to a nearby Walgreens and spoke with a pharmacist, who testified that defendant's face and hands were covered in blood. After using the bathroom, defendant told the pharmacist that he had stabbed someone in self-defense, and needed to turn himself in. Police arrived and took him into custody.

Defendant was interviewed, and portions of the videotaped interview were played for the jury. Defendant told police that he had done something wrong and needed help and treatment. He had been up for two days on drugs and had a "mental breakdown." He was "hearing things" and "snapped." He said, "I stabbed them. I know I did wrong. " His sister Christina told police that he had a "crack cocaine problem," and was using the drug frequently at the time.

Police found a trail of blood on the steps leading from the kitchen to the backyard. Chavez, Sr. was wearing one slipper, a matching slipper was found in the kitchen. Police searched for the knife but did not find it. Rudy told an officer at the scene that defendant and Nelsey argued, defendant attacked Nelsey, and Chavez, Sr. came into the room to protect her. At the trial over four years later, Rudy did not remember the argument, or seeing his father come to his mother's aid.

3

Defendant testified that he went to his father's home that morning to use the bathroom, and while he was inside the bathroom he heard screaming, Nelsey and Chavez, Sr. arguing, and Nelsey say that she was going to kill someone. When deffendant left the bathroom, Chavez, Sr. was bleeding, and Nelsey approached defendant with a knife, saying, "I'm going to kill you also." He kicked her in the chest, knocked her to the floor, and grabbed the knife out of her hand. She tried to take it back, they wrestled, and he stabbed her, probably more than twice. When she stopped assaulting him, he went to Walgreens and dropped the knife along the way. He said that Chavez, Sr. gave him money, and Nelsey did not like him asking for it.

A series of defense witnesses testified that Nelsey had repeatedly threatened Chavez, Sr. with serious harm, and that she had violent altercations with him and others.

Abel Chavez Contreras, defendant's grandfather, testified that Chavez, Sr. had an affair with a woman named Chela during the last year of his life, and that Nelsey knew about the affair. Contreras and Chela lived in Tamazula, Mexico. The last time Chavez, Sr. visited Mexico, Nelsey called Contreras and told him to tell Chavez, Sr. that "she would kill him" if he did not leave immediately. Nelsey threatened to "cut his penis" because of the affair. Contreras said Chavez, Sr. was planning to return to the United States, arrange his retirement, and retire to Mexico.

Brenda Chavez, Chavez Sr.'s niece and defendant's cousin, testified that she had heard from other family members that Chavez, Sr. had loaned Nelsey's brother $80,000, and that Nelsey had threatened to kill Chavez, Sr. Brenda communicated those facts to the police in a June 2009 letter.

Claudia Loza, Chavez, Sr.'s niece, testified that at her daughter's first birthday party Nelsey had a "bad and violent fight" with Chavez, Sr. Nelsey was hitting Chavez, Sr., and told him in front of 30 people that she would "cut it off" if he cheated on her. Nelsey also tried to hit Chavez Sr.'s brother Cesar at the party. Nelsey had a "violent" attitude, and had previously been in a fight with Cesar's wife.

Martha Lorena Hernandez Flores had a daughter with Chavez, Sr., and Nelsey was upset with the financial support Chavez, Sr. provided for their daughter. Martha testified

4

that she and Nelsey "verbally abused" each other.  In 2006, Nelsey would have slapped her in the face if Chavez, Sr. had not intervened.  Nelsey told Martha that she and her daughter "would pay" for that incident.

Chavez, Sr.'s niece and defendant's cousin, Kimberley, testified that Nelsey was an "easily heated" and "extremely jealous" woman.  Kimberley told Nelsey at a party in December of 2008 about Chavez, Sr.'s affair with Chela, which was common knowledge in the family.  Nelsey said, "he better not cheat on me," and she was "very animated, so very threatening."  Kimberley told Nelsey that Chavez, Sr. was planning to leave her and retire to Mexico. The party was followed by 45 minutes of "yelling, screaming, glass breaking."

Ramona Marin, Chavez, Sr.'s former sister-in-law, testified that he told her Nelsey said she would kill him if he left her.  Chavez, Sr. often referred to Nelsey as a "crazy woman."  Nelsey's family believed in what Marin considered "witchcraft."  Nelsey put a rooster with blood in a bucket, and Chavez, Sr. worried that he would be harmed by the curse.

Maria Sagrario, Chavez, Sr.'s sister, testified that Nelsey called Chela "the whore," and threatened to kill Chavez, Sr. over his infidelity.  Sagrario thought Nelsey would act on her threats because she was a "crazy woman."

After these witnesses testified, Gertrude Rose Chavez, defendant's mother and Chavez, Sr.'s ex-wife, was called to the stand.  Rose testified that Chavez, Sr. said he was going to leave Nelsey, and try to get custody of Rudy.  He said Nelsey called him when he was in Mexico and said she was going to kill him.

During Rose's cross-examination, the court made the evidentiary ruling contested in this appeal.  When Rose said that defendant was living on and off with her in May 2009, the prosecutor asked, "Isn't it true that you told [the police] that you didn't have your son living with you because you were afraid of him?"  She answered, "I said because I was afraid of what he would do."  Defense counsel objected and an unreported bench conference was held.

5

The questioning then continued: "Q. And you told [the police] that you were afraid of your son because of his violent tendencies? [¶] A. I didn't say violent tendencies. Q. You said he had an anger management problem, didn't you? [¶] A. On that tape that you had? [¶] Q. Yes. [¶] A. Some of the voices were my daughter's and mine. If you listen good you get confused with our voices and you get mixed up. . . . As far as my son, you are talking about that, my son gets upset. At the time I was stressed out and I can't deal with everything, if you want to know what was going on then. So I didn't want to deal with nobody at the time. [¶] . . . [¶] Q. And, in fact, you called the police because of your son's violent behavior, correct? [¶] A. At that time when he did that. If you are referring at that time when he just acted up, I guess so, yes."

After Rose and the jury were excused, defense counsel stated that he had objected to the questions about defendant's violent behavior, and said he did not believe that "the, quote, door [had been] opened" to those questions. He moved for a mistrial and the motion was denied.

Subsequently, Abel Chavez, Chavez, Sr.'s nephew and defendant's cousin, testified that he lived in Tamazula and that Chavez, Sr. lived with Chela when he came to Mexico. Abel heard a message Nelsey left at Chavez, Sr.'s home in Tamazula in January 2009. Nelsey said, "I'm going to cut your dick off and kill you motherfucker." Abel said that Nelsey became "explosive" at times. She threw things and slapped him at a party.

Abel's brother, Saul Chavez Mendez, testified that he also heard messages from Nelsey on an answering machine in which she cursed and threatened to kill Chavez, Sr.

Nelsey denied that her brother owed Chavez, Sr. $80,000. She admitted "normal jealousy," but denied leaving threatening messages for Chavez, Sr. in Mexico, and did not remember telling Kimberley that Chavez, Sr. would regret cheating on her. She did not know that Chavez, Sr. was planning to leave her for a woman in Mexico. He told her that he was planning to end the affair.

## II. DISCUSSION

Under Evidence Code section 1101, propensity evidence is generally inadmissible. However, Evidence Code section 1103, subdivision (b) provides: "In a criminal action,

evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant . . . ."

"The trial court has wide discretion in determining the appropriate scope of cross-examination" (*People v. Lucas* (2014) 60 Cal.4th 153, 228, disapproved on another ground in *People v. Romero* (2015) 62 Cal.4th 1, 53, fn. 19), and there was no abuse of that discretion here. Before the court made its ruling, a parade of defense witnesses testified to Nelsey's volatile nature, her threats of extreme violence, and her physical confrontations with Chavez, Sr. and others. In response, the prosecution was authorized under Evidence Code section 1103 to elicit evidence that defendant had also behaved violently at one point in the past. Defendant contends that his "evidence concerning Nelsey Flores was presented not to establish that Flores was the aggressor against appellant on the day of the stabbings, but to encourage the jury to conclude that Flores, rather than appellant, was the person who fatally stabbed Levit Chavez, Sr." However, that evidence was relevant to defendant's claim of self-defense, as well as to the issue of who stabbed Chavez, Sr. Moreover, the evidence of Nelsey's propensity for violence went beyond violence or outbursts directed at Chavez, Sr. for his infidelity. Witnesses described her as a crazy woman with a violent attitude who was easily heated and had threatened others besides Chavez, Sr. Defendant contends that he presented "very minimal evidence" of Nelsey's violent character that "did not paint a portrait of a violent person." We disagree. The intent and cumulative effect of the detailed and colorful defense testimony was to portray Nelsey as someone capable of deadly violence. The trial court could reasonably decide that this testimony opened the door to evidence that defendant had himself been violent, on one occasion and in some unspecified manner.

The brief cross-examination of defendant's mother was also in no way central to the prosecution's case. The prosecutor did not consider it important enough to even

7

mention in closing argument. The strong case against defendant rested primarily on other evidence, such as his confession, the neighbors' observations on the day of the incident, Rudy's account on that day and at trial, and Nelsey's testimony. Thus, any error in admitting the evidence to which defendant objected was harmless under any standard.

### III.  DISPOSITION

The judgment is affirmed.

_____
Siggins, J.

We concur:

_____
McGuiness, P.J.

_____
Pollak, J.